**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LOW TEMP INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:20-cv-00686-RWS |
| | ) | |
| DUKE MANUFACTURING CO., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF**
**LTI'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND ........................................................................................3

        A.      The Parties ........................................................................................................3

        B.      The Asserted Patents........................................................................................4

        C.      The Development of LTI's Product that Practices the Asserted Patents ...............5

        D.      Duke's Infringement and Its Market Impact...................................................7

III.    ARGUMENT AND AUTHORITIES ...........................................................................8

        A.      LTI is Likely to Succeed on the Merits. ..........................................................10

                1.      Duke Infringes the Asserted Patents. ....................................................11

                        a)      Duke Directly Infringes the Asserted Patents. ................................12

                        b)      Duke Induces and Contributes to the Infringement of the
                                Asserted Patents. ..............................................................................14

                2.      The Asserted Patents are Valid. ............................................................15

        B.      LTI Has Established a Likelihood of Irreparable Harm. ......................................16

                1.      Duke's Direct, Targeted Competition Shows Irreparable Harm. .............18

                2.      LTI's Substantial Likelihood of Lost Sales, Market Share, and
                        Business Opportunities Shows Irreparable Harm. ....................................19

                3.      LTI Will Suffer Irreparable Harm Due to Price Erosion ...........................21

                4.      Damage to LTI's Goodwill and Reputation Shows Irreparable
                        Harm ...................................................................................................22

        C.      The Balance of Hardships Factors Entry of an Injunction.....................................23

        D.      The Public Interest Will Be Served by Entry of an Injunction. .............................25

        E.      The Balance of Factors Favors Entering LTI's Proposed Injunction. ..................26

IV.     CONCLUSION...............................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Andrx Pharm., Inc.*,
  452 F.3d 1331 (Fed. Cir. 2006) ....................................................................... 12, 25

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341  (Fed. Cir. 2008) ...................................................................... 17, 21

*Acumed LLC v. Stryker Corp.*,
  551 F.3d 1323 (Fed. Cir. 2008) ................................................................. 19, 23, 24

*Akamai Techs, Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) (*en banc*) ........................................................... 14

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
  725 F.2d 1350 (Fed. Cir. 1984) ...................................................................... 10, 16

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ............................................................................ 10

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) ............................................................................ 17

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015) .............................................................................. 18

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013) ............................................................................ 11

*Atlas Powder Co. v. Ireco Chems.*,
  773 F.2d 1230 (Fed. Cir. 1985) .............................................................................. 9

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997) .............................................................................. 24

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) ............................................................................ 18

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ....................................................................... 14, 23

*Canon, Inc. v. GCC Int'l Ltd.*,
  263 F. App'x 57 (Fed. Cir. 2008) ......................................................................... 17

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ........................................................... 17, 21, 22, 24

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*,
   908 F.2d 951 (Fed. Cir. 1990) ................................................................................ 9

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632, 135 S. Ct. 1920 (2015) .................................................................. 11

*D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*,
   917 F.3d 994 (8th Cir. 2019) .................................................................................. 9

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
   640 F.2d 109 (8th Cir. 1981) .................................................................................. 9

*Dixon v. City of St. Louis*,
   950 F.3d 1052 (8th Cir. 2020) ................................................................................ 9

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ..................................................................... *passim*

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................................................ 9

*Fujitsu Ltd. v. Netgear Inc.*,
   620 F.3d 1321 (Fed. Cir. 2010) ............................................................................ 15

*FURminator, Inc. v. Kim Laube & Co.*,
   No. 4:08CV00367 ERW, 2011 WL 1226944 (E.D. Mo. Mar. 30, 2011) ................ 20

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 S. Ct. 2060 (2011) .......................................................................... 14

*Henkel Corp. v. Coral, Inc.*,
   754 F. Supp. 1280 (N.D. Ill. 1990),
   *aff'd*, 945 F.2d 416 (Fed. Cir. 1991) .................................................................... 20

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .................................................................. 18, 24, 25

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
   468 F.3d 1366 (Fed. Cir. 2006) ............................................................................ 15

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   572 U.S. 915, 134 S. Ct. 2111 (2014) ........................................................ 3, 11, 14

*Litton Sys., Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984) ......................................................................... 8, 24

*M/A-COM Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.*,
   No. 14-181-LPS, 2014 WL 2727198 (D. Del. June 13, 2014) .............................. 19

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) .................................................................................. 11

*Monsanto Co. v. McFarling*,
    No. 4:00-CV84CDP, 2001 WL 34082053 (E.D. Mo. Apr. 18, 2001),
    *aff'd*, 302 F.3d 1291 (Fed. Cir. 2002) .................................................. 9, 10

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................ 11

*Payless Shoesource, Inc. v. Reebok Int'l Ltd.*,
    998 F.2d 985 (Fed. Cir. 1993) ................................................................. 25

*Philips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................ 11

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
    472 F.3d 1338 (Fed. Cir. 2006) ................................................................ 12

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ................................................................. 19

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ................................................................ 16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ................................................................ 18

*Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570 (Fed. Cir. 1985) ................................ 15

*Revision Military, Inc. v. Balboa Mfg. Co.*,
    700 F.3d 524 (Fed. Cir. 2012) ................................................................... 9

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ....................................................... *passim*

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ....................................................... 9, 21, 25

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
    920 F.3d 777 (Fed. Cir. 2019) .................................................................. 25

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ................................................................ 10

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) ................................................................ 15

*TiVo Inc. v. EchoStar Commc'ns Corp.*,
  446 F. Supp. 2d 664 (E.D. Tex. 2006),
  *aff'd in part, rev'd in part on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008) ........................ 25

*Trak Inc. v. Benner Ski KG*,
  475 F. Supp. 1076 (D. Mass. 1979) ..................................................................... 26

*Trebro Mfg., Inc. v. Firefly Equipment, LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) .......................................................... *passim*

*Warner-Lambert Co. v. Teva Pharm. USA, Inc.*,
  418 F.3d 1326 (Fed. Cir. 2005) ........................................................... 12

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) ............................................................ 23

*Winter v. Natural Res. Def. Council, Inc.*,
  129 S. Ct. 365 (2008) ....................................................................... 9

*Wyeth v. Nat. Biologics, Inc.*,
  395 F.3d 897 (8th Cir. 2005) .............................................................. 21

## **Statutes**

35 U.S.C. § 154(a)(1) ........................................................................... 24

35 U.S.C. § 271(a) ............................................................................... 11

35 U.S.C. § 271(b) ............................................................................... 11

35 U.S.C. § 271(c) ............................................................................... 11

35 U.S.C. § 282 .................................................................................. 15

## I.     INTRODUCTION

Plaintiff Low Temp Industries, Inc. ("LTI") submits this Memorandum in support of its Motion for Preliminary Injunctive Relief against its competitor Duke who copied LTI's flagship QuickSwitch product covered by three of LTI's patents.  LTI is the market leader in food presentation modules employing "hot-cold-freeze" ("HCF") technology, which allows for individual food wells within a single module to be set to any temperature, regardless of the temperature of other neighboring food wells.  LTI made substantial investments to develop and promote the patented QuickSwitch, which was the first HCF system, and relies on QuickSwitch as an exclusive offering for its customers.  As of April 2020, Duke is manufacturing, selling, and installing its own HCF product, which it admittedly copied from LTI's inventive design despite having both actual and constructive knowledge of LTI's patents.  The introduction of Duke's HCF product into the market will irreparably harm LTI, and Duke should be enjoined from selling its copycat product.

For over sixty years, LTI has transformed the way food is served with its inventive food service equipment.  In the 1960s, LTI began working with the U.S. Armed Forces to provide steam tables at military bases.  In the 1970s, LTI focused on stainless steel construction, building its first soiled dish conveyor system.  And in 1995, LTI invented its patented Temp-est Aire technology, which allows air flow to circulate below pans, preventing food within the pans from drying out.

LTI continued developing its technology to ensure high-quality products and optimal performance for its customers.  In the 2000s, Ben Shackelford invented the first HCF food presentation module, which not only allowed for food wells within a single module to be controlled thermally independent of one another, but also allowed individual food wells within the module to switch from hot-to-cold-to-frozen in an hour or less.  LTI branded the system "QuickSwitch," and it became the only HCF system in the food service industry.

On June 16, 2008, LTI applied for a patent for its QuickSwitch technology and was granted a patent that issued on November 13, 2012 as U.S. Patent No. 8,307,761 (the "'761 Patent"). The Patent Office also granted LTI two continuation patents on the technology—U.S. Patent Nos. 8,661,970 (the "'970 Patent") and 9,895,253 (the "'253 Patent") (collectively, the "Asserted Patents"). LTI's Asserted Patents are now being infringed by Duke.

LTI's patented technology has been a game-changer for foodservice operators, truly differentiating LTI from its competition. Until now, LTI had the only HCF product available. In fact, for over 5 years, Duke purchased LTI's QuickSwitch through a distributor to drop in to its own countertops.[1] In the spring of 2019, Duke approached LTI requesting to purchase QuickSwitch directly from LTI to avoid paying the premium involved in purchasing through distributors. LTI declined. In response, Duke ceased purchasing QuickSwitch and informed LTI that it would make its own HCF product that was a copy of QuickSwitch. Duke did just that, without the permission or authorization of LTI, and sold its first HCF product in April 2020.

As a result of Duke cancelling its purchase agreement with LTI's distributor and making its own infringing product, LTI has suffered significant commercial injury. LTI has lost customers (including Duke, itself) and has experienced incalculable erosion to its goodwill and reputation. If Duke is allowed to continue marketing and promoting its HCF product, then LTI will continue to suffer irreparable harm, including loss of sales, market share, profit and goodwill.

Accordingly, LTI seeks a preliminary injunction prohibiting Duke from making, using, selling, offering for sale, and/or importing the infringing HCF product.

---

[1] LTI does not sell any QuickSwitch directly to consumers.

## II.    FACTUAL BACKGROUND

### A.    The Parties

LTI, formerly Low Temp Manufacturing Company, was founded in 1947 in Atlanta, Georgia.  LTI's principal business is designing, manufacturing, selling, and distributing food serving products and solutions.  (Dkt. 1, ¶ 1).  For nearly thirty years, LTI has been the predominant company in its field and widely-respected in the United States.  (*Id.* ¶ 2).  LTI's patented QuickSwitch technology continues to revolutionize the way food is served at hospitals, universities, quick service restaurants ("QSRs"), supermarkets, and corporate dining areas across the country.  (Ex. 1, ¶¶ 9-10, 18-19).  Due to the technological advances it offers, operators love the menu flexibility QuickSwitch provides.  (*Id.* ¶ 17).

Until Duke's infringement, LTI's QuickSwitch was the only food presentation module with independently-controlled wells that can switch between hot, cold, and frozen regardless of the temperature of any other well.  (*Id.* ¶ 31).  Food service businesses around the country trust and respect LTI, and purchase, use, and respect its products, including QuickSwitch, precisely because LTI consistently provides first-of-its-kind serving technology to enhance menu flexibility and merchandising options for its customers.  (*Id.* ¶ 18).

Duke first informed LTI it was developing its own infringing HCF product in 2019.  (*Id.* ¶ 23).  Previously, Duke sold its own counters but purchased LTI's QuickSwitch to "drop in" to its counters.  (*Id.*; Dkt. 1, ¶ 7).  It was not until LTI refused to sell QuickSwitch directly to Duke so that Duke could avoid purchasing through normal distribution channels, that Duke decided to manufacture an HCF product copied from QuickSwitch.  (Ex. 1, ¶ 23; Dkt. 1, ¶ 7).

Duke has aggressively marketed its HCF product to LTI's customers.  (Ex. 1, ¶ 26).  Its marketing materials directly compare its product to LTI's QuickSwitch product and undercut LTI's pricing.  (*Id.* ¶ 40; Dkt. 1, ¶ 35; Ex. L at 3).  Further, Duke has submitted bids in response

to at least one Request for Proposal ("RFP") competing with LTI's bids.  (Ex. 1, ¶¶ 26, 37; Dkt. 1, ¶ 34).

### B.    The Asserted Patents

The Asserted Patents, entitled "Multi-Well Food Presentation Modules," all claim priority to Application No. 12/139,629 filed on June 16, 2008 and share a specification.  (Dkt. 1, ¶ 4; Exs. D-F).  The Asserted Patents relate to "thermally convertible food presentation modules," where a "single module may be used for both heating and refrigeration of foodstuffs as desired at any given time," and "any well of a module may be switched between heating and cooling of food regardless of the status of any other well of the module."  (Ex. D, Abstract).  An example of such a module is shown in Fig.  2 (reproduced below).



FIG. 2

Prior to the Asserted Patents, food presentation equipment was dedicated to either heating or cooling food contained in wells.  (*Id.* at 1:33-35).  But, as explained in the Asserted Patents, providing uniform temperatures for all wells may be undesirable.  (*Id.* at 1:57-58).  For example, wells that are uniformly heated or cooled would not be desirable for a taco bar, which includes hot meat and cold lettuce and cheese, as "at least one such component will be served at an undesired (and perhaps unsanitary) temperature."  (*Id.* at 1:58-64).  The Asserted Patents solve these problems by providing a food presentation module having multiple wells, each of which "is isolated thermally from adjacent wells and has an independently-controlled heating and cooling

system." (*Id.* at 2:31-32). As such, each well may be switched from heating to cooling regardless of the status of any other well. (*Id.* at 2:15-28).

The claims in the Asserted Patents generally describe a food presentation module that includes (a) a plurality of wells for receiving containers of bulk food, where each well is individually insulated and thermally isolated from an adjacent well, and (b) a temperature-control system for controlling temperatures of the wells independently, which allows food received in one well to be refrigerated to a temperature substantially below ambient, while food received in an adjacent well may be heated to a temperature substantially above ambient, and wherein temperatures of each well may be switched regardless of the temperature of any other well. (*Id.* at Cl. 1-4).

### C.    The Development of LTI's Product that Practices the Asserted Patents

LTI's QuickSwitch practices the Asserted Patents. (Dkt.1, ¶ 4). As stated on LTI's website, "QuickSwitch patented serving technology is the first of its kind – providing the ultimate in menu flexibility and merchandising options." (Ex. T at 1). With QuickSwitch, each serving well is thermally isolated and independently controlled to be hot, cold, or frozen. (Ex. 1, ¶ 14; Ex. 3, ¶ 4; Ex. S). Further, each well can switch between hot, cold, and freezing in an hour or less. (Ex. 3, ¶ 4). QuickSwitch may be sold built in to a counter or as a "drop in" to be used in another counter (shown below). (Ex. 1, ¶ 15; Ex. T at 3).



LTI's development of QuickSwitch was driven by consumer demands. (Ex. 1, ¶¶ 12-13). As described above and in the Asserted Patents, before QuickSwitch, food service equipment could heat or cool wells, but could not do both simultaneously. (*Id.*). Consistently, consumers expressed that they wanted to provide menu flexibility and versatility, but did not want to have to purchase multiple pieces of equipment—i.e. dedicated hot units and dedicated cold units—to do so. (*Id.* ¶ 13). Further, they did not want physically replace cold stations with hot stations—and certainly didn't have the space to store multiple food stations. (*Id.*). Recognizing its consumers' need for versatility of menu and their space limitations, LTI developed QuickSwitch, which allows consumers to switch menus using the ***same unit***. (*Id.* ¶ 14).

Originally, LTI only sold completed modules—QuickSwitch built in to LTI counters. (*Id.* ¶ 15). However, starting in 2012, as a result of consumer demand and to increase market presence, LTI began selling QuickSwitch as a drop-in such that it could be used with existing counters. (*Id.*). Thus, consumers and other manufacturers, such as Duke, could buy QuickSwitch and insert it into their own counters. (*Id.*)

LTI emphasizes the innovation and "first of its kind" nature of QuickSwitch, as claimed in the Asserted Patents. (*Id.* ¶ 18). Another key selling point for the patented QuickSwitch technology is that it provides customers "the ultimate in menu flexibility and merchandising options." (Ex. T at 1). Indeed, in a largely stable overall market, LTI has successfully grown its market share and is the market leader with respect to food serving products. (Ex. 1, ¶¶ 30-31). The patented QuickSwitch technology is the key to this success and has become the industry norm. (*Id.* ¶ 22). In fact, after over a decade of LTI marketing and investment, consumers have come to identify the QuickSwitch product as the only HCF product in the marketplace. (*Id.* ¶ 20).

Moreover, LTI's products have high user satisfaction, and customers frequently re-purchase LTI products. (*Id.* ¶ 39). For example, one of LTI's customers is the food service director of the Duval County, Florida school district—one of the largest in America—who purchases QuickSwitch for use in school cafeterias. (*Id.* ¶ 16). In this district, 5-10 school cafeterias are renovated per year. (*Id.*). Thus, LTI's service deal with the Duval County schools necessarily means QuickSwitch is being sold and installed repeatedly in various schools. (*Id.*). But, because of the coordinated purchasing within the district, a loss of one sale in a school district very likely means a loss of subsequent sales within that district. (*Id.* ¶ 38).

### D.    Duke's Infringement and Its Market Impact.

At the beginning of this year, Duke publicly announced its HotColdFreeze[TM] product ("HCF Product"). (Ex. 1, ¶ 24). Duke's HCF Product infringes the Asserted Patents. (Dkt. 1, ¶ 5; Ex. 2, § VI). In fact, prior to announcing its HCF Product, Duke informed LTI that it was planning to sell its own HCF product, which it copied from QuickSwitch. (Dkt. 1, ¶ 7; Ex. 1, ¶ 23). And in Exhibit 2, LTI's expert details how Duke's HCF Product meets the elements of the patent claims, and how Duke's actions have directly and/or indirectly infringed the claims.

Duke's efforts are directly targeted to take market share from LTI. (Dkt. 1, ¶ 36). The market for QuickSwitch includes the education industry, the military, and restaurant chains. (Ex. 1, ¶ 16). Duke is the second, and only other company to manufacture a competitive HCF product.[2] (*Id.* ¶ 35; Dkt. 1, ¶ 36). Until Duke's infringement, LTI's QuickSwitch was the only HCF product, and the only product that met both the NSF-4 Commercial Cooking, Rethermalization, and

---

[2] A few other companies submit bids, but are not LTI's competitors in the HCF market. (Ex. 1, ¶¶ 32-34). Vollrath Co., L.L.C. provides a hot-cold module, without freezing capabilities. (*Id.* ¶ 33). In addition, the Vollrath module is not NSF7 compliant. (*Id.*). G.A. Systems, Inc. is the only other manufacturer of hot-cold systems (no freezing capabilities), but its geographic scope is limited to Southern California. (*Id.*). Neither company has more than nominal market share. (*Id.*).

Powered Hot Food Holding and Transportation Equipment standard ("NSF-4") and NSF-7 Commercial Refrigerators and Freezers standard ("NSF-7"). (Ex. 1, ¶ 31; Ex. 3, ¶ 11). The NSF-4 and NSF-7 standards are food service standards that are generally prerequisites for any bid with potential customers. (Ex. 1, ¶ 31).

Duke is promoting the infringing HCF Product to the same retailers, distributors, and consumers served by LTI. (*Id.* ¶ 26; Dkt. 1, ¶ 36). Duke's materials directly compare its HCF Product to LTI's QuickSwitch, highlighting the similarity of the features. (Dkt. 1, ¶ 35; Ex. L at 3). Duke's entrance into the market will necessarily displace LTI's product in light of the few market participants and niche nature of the market. (Dkt. 1, ¶¶ 8, 36; Ex. 1, ¶ 35).

Moreover, Duke has priced its product about 10% below LTI's product for each of its 2, 3, and 4 well configurations. (Ex. 1, ¶ 40). Indeed, Duke markets its product as "low cost" compared to the "very expensive" LTI product. (Ex. L at 2). Given Duke is offering its HCF Product at a lower price point than LTI's product, LTI will be forced to either lower its pricing or face further loss of sales and reputational damage. (Ex. 1, ¶ 40). Even worse, Duke admittedly copied LTI's patented technology. (Dkt. 1, ¶¶ 7, 33). Moreover, Duke's HCF Product is made of inferior materials, which may cause performance and durability problems that may be wrongly attributed to HCF products as a whole. (Ex. 3, ¶ 12). As such, LTI now finds itself competing against an inferior-built product that copies the inventive technology LTI has patented.

## III.    ARGUMENT AND AUTHORITIES

LTI respectfully seeks the Court's assistance to maintain the status quo by preventing patent infringement, erosion of LTI's market share and pricing, and loss of LTI's customer goodwill and reputation. The purpose of a preliminary injunction is "to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984). Preserving the status quo does not include continuing past

infringement, merely that the injunction "not undertake to assess the pecuniary or other consequences of past trespasses." *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985).  A preliminary injunction should be granted when:

> (1) the plaintiff has a reasonable likelihood of success on the merits;
>
> (2) the plaintiff has suffered irreparable injury;
>
> (3) the balance of the hardships weigh in favor of the injunction; and
>
> (4) the public interest would not be disserved by the injunction,

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1374 (Fed. Cir. 2006); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006) (holding that traditional principles of equity "apply with equal force to disputes arising under the Patent Act").[3]  Courts balance these four factors as their relative weights warrant. *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1297 (Fed. Cir. 2002).  A strong showing on one factor can compensate for a lesser position on another. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).

LTI submits compelling evidence to satisfy and support each of these factors.  First, LTI has a reasonable likelihood of success on the merits.  As detailed below, Duke infringes at least

---

[3] "The grant, denial, or modification of a preliminary injunction . . . is not unique to patent law, so this court applies the law of the regional circuit when reviewing and interpreting such a decision." *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014) (citation omitted). However, "[s]ubstantive matters of patent infringement are unique to patent law, and thus the estimated likelihood of success in establishing infringement is governed by Federal Circuit law." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012).  Nonetheless, the Eighth Circuit applies the same four factor test.  *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019) ("When determining whether to issue a preliminary injunction, the district court considers: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc))); *see also Dixon v. City of St. Louis*, 950 F.3d 1052, 1055 (8th Cir. 2020).

one claim of each Asserted Patent, and the claims are valid and enforceable.  Second, if Duke is not enjoined from its infringing activity, LTI will be irreparably harmed, LTI's pricing and market share will erode, and LTI's good-will and reputation will be diminished.  LTI has invested significant time and resources in developing the patented technology, and Duke should not be allowed to take advantage of that.  As such, monetary damages alone cannot make LTI whole. Third, as shown below, LTI's hardships in the absence of an injunction would far outweigh any hardship to Duke if it could not continue to infringe the patents.  Fourth, it is in the public interest to enforce patents and thereby encourage others to invent and utilize the patent system.  Finally, LTI is willing and able to post a sufficient security, as determined by the Court, in support of LTI's Motion for Preliminary Injunction to hold Duke harmless from any damage in the unlikely event of a later determination that the preliminary injunction was improvidently granted.  Accordingly, the Court should grant LTI's requested preliminary injunction in this matter.

### A.      LTI is Likely to Succeed on the Merits.

LTI will prove Duke infringes one or more of its patent claims, and at least one of those claims will withstand a validity challenge.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Monsanto Co. v. McFarling*, No. 4:00-CV84CDP, 2001 WL 34082053, at *5 (E.D. Mo. Apr. 18, 2001), *aff'd*, 302 F.3d 1291 (Fed. Cir. 2002).  While LTI understands that Duke will likely challenge the validity and enforceability of the Asserted Patents, Duke must bring forth more than a mere rehashing of the prosecution history.  *See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984) ("When an attacker simply goes over the same ground travelled [sic] by the PTO, part of the *burden* is to show that the PTO was wrong in its decision to grant the patent."), *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).  As detailed below, the high likelihood LTI will succeed on both infringement and validity supports the requested preliminary injunction.

### 1.    Duke Infringes the Asserted Patents.

It "is 'more likely than not'" that Duke infringes LTI's Asserted Patents. *Trebro*, 748 F.3d at 1166 (citation omitted).  The infringement analysis involves (1) construing the relevant claims and (2) determining whether the construed claims read on the accused products.  *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 374 (1996).  Claim construction is a matter of law; however, "district courts are not (and should not be) required to construe every limitation present in [the] asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  The specification and prosecution history, i.e., the intrinsic evidence, are the best guides to claim scope if there is a legitimate disagreement over the scope of the claims. *See Philips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  However, claim terms that can be readily understood by one skilled in the art or a lay juror do not need construction. *See id.*

A patent may be infringed directly or indirectly.  *See* 35 U.S.C. §§ 271(a)-(c).  "Direct infringement is a strict-liability offense." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 135 S. Ct. 1920, 1926 (2015) (citation omitted).  To be liable for direct infringement, a party "must commit all the acts necessary to infringe the patent, either personally or vicariously." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013) (citations omitted).

A party is liable for indirect infringement if that party induces or contributes to infringement.  *See* 35 U.S.C. §§ 271(b), (c).  Unlike direct infringement, however, induced infringement and contributory infringement requires knowledge of the patent and infringement. *Commil*, 575 U.S. 632, 135 S. Ct. at 1926.  To prove indirect infringement, a plaintiff must also prove that there is direct infringement. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 134 S. Ct. 2111, 2117 (2014).

Here, there can be no rational dispute about the meaning of the claim terms. They are ordinary terms understood by those skilled in the relevant art in light of the patents' specification, and thus no construction of claim terms is needed by the Court. (Ex. 2, ¶ 14). And, as detailed in the Dr. Mayor's Declaration, Duke's HCF Product meets each and every element of at least claims 3, 4, 9, 10, 11, 13, 15, and 16 of the '761 Patent, at least claims 2, 3, 6-9, 11-13, 15-17, 19, 21, 22, 25, and 26 of the '970 Patent, and at least claims 2, 3, 11, 12, and 14-19 of the '253 Patent. (*See id.* § VI).[4] Further, Duke induces and/or contributes to the performance of each element of at least one claim of each Asserted Patent by a third party. (*See id.* § VII).

### a)      Duke Directly Infringes the Asserted Patents.

Duke's HCF Product directly infringes the Asserted Patents. The Asserted Patents include claims to a method for presenting food and claims to the food presentation equipment. To prove infringement, LTI must show that the accused Duke method or product meets each claim limitation either literally or under the doctrine of equivalents. *See, e.g.*, *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1343 (Fed. Cir. 2006); *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005) (citation omitted). Duke's HCF Product, as offered for sale, meets each asserted claim limitation.

As admitted by Duke, its HCF Product is a copy of LTI's QuickSwitch. (Ex. 1, ¶ 23). It also infringes the Asserted Patents. (Ex. 2, § VI). Provided below is a side-by-side comparison of Duke's HCF Product (left) and Figure 2 of the Asserted Patents (right):

---

[4] "In order to establish the first preliminary injunction factor, [Plaintiff] must show that it will likely prove that [Defendant] infringes at least one valid and enforceable patent claim." *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007); *Curlin Med. Inc. v. Acta Med., LLC*, 228 F. Supp. 3d 355, 358 (D.N.J. 2017).



(Ex. N at 2; Ex. D, Fig. 2). In addition to looking nearly identical, Duke's marketing materials for its HCF Product demonstrate its inclusion of each claim element. (*See* Ex. 2, § VI).

The claims of the Asserted Patents generally recite a food presentation module with the following features:

> (a) a plurality of uncovered wells for receiving containers of bulk food, where each well is individually insulated and thermally isolated from an adjacent well; and

> (b) a temperature-control system for controlling temperatures of the wells independently, allowing food in one well to be refrigerated to a temperature substantially below ambient, while food in an adjacent well is heated to a temperature substantially above ambient, and wherein temperatures of each well may be switched regardless of the temperature of any other well.

(*See, e.g.*, Ex. D, Cl. 1-4). Duke's marketing materials describe Duke's HCF Product as including all of these features. For example, Duke's HCF Product includes (a) multiple wells for receiving containers of food, where "[e]ach individual well can operate Hot Dry, Hot Wet, Cold or Freeze;" and (b) "1 control per food well" with multiple thermal settings—"3 wet heat, 3 dry heat, 3 refrigerated and 1 freeze mode"—so that you can "[h]old hot foods side-by-side with cold foods while maintaining proper temperatures for both" and "change your serving configuration . . . as your menu dictates." (Ex. I at 2). In addition, Dr. Mayor's declaration shows how Duke's HCF Product meets every element of every asserted claim. (*See* Ex. 2).

b)      **Duke Induces and Contributes to the Infringement of the Asserted Patents.**

To the extent Duke argues it is not directly infringing the Asserted Patents, Duke is indirectly infringing the claims by inducing and/or contributing to the direct infringement by customers and/or operators of its HCF Product.  (*See* Ex. 2, § VII).  Indirect infringement by inducement requires that the alleged inducer has "knowingly induced infringement and possessed specific intent to encourage another's infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) (en banc) (citation omitted).  Intent may be established through circumstantial evidence, or inferred from the facts.  *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008).  "It is enough that the inducer 'cause[s], urge[s], encourage[s], or aid[s]' the infringing conduct and that the induced conduct is carried out." *Akamai*, 692 F.3d at 1308 (alterations in original) (citation omitted).   Proof of contributory infringement requires showing that the infringer (a) sold or offered to sell a product that is a material part of another's invention and not otherwise a staple item of commerce suitable for substantial non-infringing use, and (b) knew of the patent and that the product is especially made for an infringing use.  *See, e.g., Global-Tech Appliances, Inc. v  SEB S.A.*, 563 U.S. 754, 763-65 (2011).

Duke is liable for indirect infringement.  As shown above, the Duke HCF Product directly infringes the Asserted Patents.  Duke is also inducing infringement by teaching every step of the patented method and the particular combinations of the system claims.  (Ex. 2, § VII).  Duke contributes to the infringement of the Asserted Patents as it supplies its HCF Product as a drop in for a counter, and there is no substantial non-infringing use of the product.  (*Id.*).

Duke knew of LTI's patent rights before making its HCF Product, having been a purchaser of LTI's QuickSwitch, which LTI markets as a patented product.  (Dkt. 1, ¶¶ 7, 32).  And Duke's admission that it designed its HCF Product to infringe evidences Duke's intent to induce and/or

contribute to infringement. Duke specifically promotes and explicitly instructs third parties to install and use the HCF Product in an infringing manner. (Ex. 2, § VII). Duke's HCF Product is knowingly and specially made to infringe the Asserted Patents, and is not a staple item of commerce suitable for other uses. (*Id.*); *see Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

### 2.    The Asserted Patents are Valid.

The Asserted Patents are presumed valid. *See* 35 U.S.C. § 282. This presumption exists at every phase of the litigation, including the preliminary injunction stage, and alone suffices to demonstrate a likelihood of success on validity. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). Because of this presumption, "the burden of persuasion to the contrary is and remains on the party asserting invalidity." *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985); *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006). Thus, to defeat a preliminary injunction based on invalidity, Duke must show that it is "more likely than not that [it] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Titan Tire*, 566 F.3d at 1379. Duke has not and cannot meet its burden here. Duke has identified allegedly invalidating pieces of prior art to LTI, but none of these references raise a substantial question of validity. Its primary reference, International Publication No. WO 00/71950, was cited during prosecution of the '253 Patent. (*See* Ex. F). Two other identified references, U.S. Patent Nos. 4,593,752 and 4,856,579, are cited and described as prior art in WO 00/71950. While some of Duke's prior art references relate to food service modules that are able to heat food and cool food – none disclose food service modules were unable to simultaneously heat one well and cool another and vice versa. Moreover the references do not disclose modules with wells that are isolated thermally from adjacent wells and have an independently-controlled heating and cooling system for each well as claimed in the

Asserted Patents. This is not surprising as LTI's patented inventions are based on its QuickSwitch, which was the first HCF product. Thus, Duke cannot demonstrate it will succeed in alleging invalidity.

Moreover, the alleged infringer cannot merely rehash the prosecution history to challenge validity. *See Am. Hoist & Derrick Co.*, 725 F.2d at 1359. As the Federal Circuit explained:

> When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co.*, 725 F.2d at 1359). To raise a substantial question of validity using prior art cited or reviewed by the examiner during prosecution, an alleged infringer must overcome two presumptions: (1) that the patent is valid; and (2) that the USPTO properly performed its function in reviewing the prior art before issuing the patent. *Id.* Here, the application leading to the '761 Patent was subjected to over four years of examination at the Patent Office. (*See* Ex. D). The examiner reviewed 21 pieces of prior art. (*See id.*). With respect to the '970 and '253 Patents, the examiner reviewed additional prior art, reviewing 33 pieces of prior art prior to allowing the '970 Patent and 41 pieces of prior art prior to allowing the '253 Patent. (*See* Exs. E, F). The Asserted Patents issued over the prior art, and thus no substantial question of validity can be sustained by Duke.

### B.    LTI Has Established a Likelihood of Irreparable Harm.

LTI will suffer irreparable harm if the Court does not grant preliminary injunction against Duke. Courts recognize several grounds for finding irreparable harm, including loss of market share, loss of sales, price erosion, loss of goodwill and reputation, and lost business opportunities.

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013) ("Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction."); *Celsis in Vitro, Inc. v. Cellz-Direct, Inc.*, 664 F.3d 922, 930-31 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."); *Bosch*, 659 F.3d at 1151 (finding overwhelming evidence of irreparable harm from (1) the parties' direct competition; (2) loss in market share and access to potential customers resulting from the defendant's introduction of infringing products; and (3) defendant's lack of financial wherewithal to satisfy a judgment"); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) (affirming district court's finding that patentee's loss of market share, revenue, market opportunities, goodwill, and price erosion were irreparable).  All of these grounds are present here, and are exacerbated by the willful copying of LTI's inventions that Duke *previously purchased* to use in its own counters.  Absent a preliminary injunction, LTI will suffer irreparable harm from (1) direct competition with Duke; (2) loss of sales, market share, and business opportunities; (3) price erosion; and (4) loss of goodwill and reputation.  This harm is unquantifiable and cannot be remedied by monetary damages alone.  *See Trebro*, 748 F.3d at 1170-71; *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008) ("Due to the difficulty (if not impossibility) of determining the damages resulting from price erosion and loss of market share, an award of money damages would not be sufficient.").

Further, "a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359, 1363-64 (Fed. Cir. 2013) (citation omitted).  The Asserted Patents cover both the HCF Product Duke is incorporating into its countertop as well as the combined HCF Product and countertop, necessarily resulting in a

causal nexus between Duke's sales and infringement.  As such, the causal nexus requirement is met as there is no risk that LTI might be "leverag[ing] its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant."  *Apple*, 735 F.3d at 1361 (citation omitted).  Without being enjoined, Duke will continue to use LTI's patented technology to produce a product that substantially harms LTI's business.

### 1.    Duke's Direct, Targeted Competition Shows Irreparable Harm.

Duke's infringing HCF Product directly competes with LTI's QuickSwitch, resulting in immediate loss of business to LTI, including loss of sales, market share, and opportunities in the United States.  (Ex. 1, ¶¶ 35-39, 42-47).  "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).  Where the parties "are direct competitors selling competing products . . . the record strongly shows a probability for irreparable harm."  *Trebro*, 748 F.3d at 1171; *see also Douglas Dynamics*, 717 F.3d at 1345; *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336-39 (Fed. Cir. 2013); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151-55 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010).

It is indisputable that LTI and Duke are direct competitors and that LTI will lose sales and market share from Duke's entry into the market.  Prior to Duke's infringing HCF Product, LTI manufactured the only HCF product, QuickSwitch, which Duke purchased to drop in to its counters.  (Ex. 1, ¶ 23).  Duke's HCF Product now directly competes with QuickSwitch, and LTI will necessarily lose sales from Duke's entry into the market, including sales to Duke.  As such, LTI will be irreparably harmed absent an injunction.  *See Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 653 (Fed. Cir. 2015) (holding that "competition between the patentee and the infringer, particularly direct competition, strongly militates toward a finding of irreparable harm").

Moreover, LTI and Duke are the *only* competitors in the HCF market. (Ex. 1, ¶ 35). Thus, this factor is especially compelling as LTI and Duke "are toe-to-toe competitors in a unique marketplace." *Apple Inc.*, 809 F.3d at 654; *Bosch*, 659 F.3d at 1151 (noting the "the existence of a two-player market may well serve as a substantial ground for *granting* an injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee"); *see also M/A-COM Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.*, No. 14-181-LPS, 2014 WL 2727198, at \*5 (D. Del. June 13, 2014) (finding irreparable harm where "[plaintiff] has proven that it has had to give price concessions to Ford, which were required at least in large part because of the emergence of a competitor for technology previously sold only by [plaintiff]"); *cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction. . . . Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."). LTI should not have to compete with a copycat product that infringes its own patents. "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345. Accordingly, LTI would be irreparably harmed absent an injunction.

### 2.    LTI's Substantial Likelihood of Lost Sales, Market Share, and Business Opportunities Shows Irreparable Harm.

LTI will suffer an unquantifiable loss of business, market share, and market opportunities if Duke is not enjoined. The likelihood of losing customers and market share is evidence of irreparable harm. *Trebro*, 748 F.3d at 1170 (finding legal error in lower court's dismissing evidence of likely lost customers and share); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1329 (Fed. Cir. 2008) ("Adding a new competitor to the market may create an irreparable harm . . . .");

*FURminator, Inc. v. Kim Laube & Co.*, No. 4:08CV00367 ERW, 2011 WL 1226944, at *2 (E.D. Mo. Mar. 30, 2011). "[L]oss of market share constitutes irreparable injury 'because market share is so difficult to recover.'" *Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1322 (N.D. Ill. 1990) (citations omitted), *aff'd*, 945 F.2d 416 (Fed. Cir. 1991).

LTI has lost sales to Duke, at least due to Duke's manufacture of its own HCF Product, and will continue to lose sales from Duke's infringing HCF Product. (Ex. 1, ¶¶ 36-39). While it might be possible to calculate how many infringing products Duke has sold at the conclusion of this litigation, it will be impossible to determine what LTI's market position would have been had it been able to exploit the benefit of its patented technology. *See Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (recognizing that "future infringement . . . may have market effects never fully compensable in money").

QuickSwitch is the market-leading HCF product. (Ex. 1, ¶ 30). And prior to Duke's infringement, QuickSwitch was the only HCF product in the market. (*Id.* ¶ 31). Now, LTI and Duke are the only two significant participants in the manufacture and sale of HCF products in the United States. (*Id.* ¶ 35). Some customers are first-time buyers who may never come to LTI for equipment if they buy their first HCF product from Duke. (*Id.* ¶ 39). Further, Duke is submitting bids to LTI's regular customers that compete with LTI's bids. (*Id.* ¶ 37). Thus, every sale made by Duke is a potential lost sale to LTI. (*Id.*). Further, every lost sale is a potential lost customer to LTI. (*Id.* ¶ 38). These losses and the loss of future sales of LTI's core, patented product are unquantifiable and cannot be remedied by damages alone. *See Trebro*, 748 F.3d at 1170-71.

Moreover, LTI is at a significant disadvantage in competing with Duke's marketing and distribution budget as Duke is unburdened by the costs of developing and obtaining protection for these innovative and patented products. (Ex. 1, ¶ 47). Once Duke secures its position in this

market segment, it will be virtually impossible for LTI to wrest that market share from Duke. (*Id.*). Losing customers and market share to an unlicensed, infringing competitor is precisely the type of harm the patent laws are designed to protect against. *See Trebro*, 748 F.3d at 1170-71. Thus, it is clear that LTI will suffer irreparable harm if Duke's conduct is not enjoined. *See Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 902-03 (8th Cir. 2005) (affirming permanent injunction where defendant would cause "irreparable harm in the form of loss of market share").

### 3.    LTI Will Suffer Irreparable Harm Due to Price Erosion.

Duke's continued marketing of products that infringe the Asserted Patents will erode the price LTI is able to obtain for these products in ways that cannot be quantified. Price erosion often constitutes irreparable harm in preliminary injunction cases. *See Abbott Labs.*, 544 F.3d at 1361-62 (finding price erosion and loss of market position are evidence of irreparable harm); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Bosch*, 659 F.3d at 1154; *Sanofi-Synthelabo*, 470 F.3d at 1382.

Duke has priced its HCF Product about 10% below the competing LTI product. (Ex. R). For example, its three-well configuration is priced $707.60 less than LTI's three-well product. (*Id.*; Ex. 1, ¶ 40). Thus, without preliminary injunctive relief, LTI will be forced to either reduce the price of QuickSwitch to offset competition from Duke or face further loss of sales and reputational damage. (Ex. 1, ¶ 40). This puts LTI in the untenable position of either alienating customers and losing revenue by maintaining current pricing or dropping prices during the period of infringement, not only causing a diminution in current revenue, but also making it difficult or impossible to raise prices later. (*Id.* ¶¶ 40-41). Either way, LTI will be irreparably harmed without an injunction. *See, e.g.*, *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Bosch*, 659 F.3d at 1154; *Sanofi-Synthelabo*, 470 F.3d at 1382.

LTI's price structure reflects investment into research and development as well as costs related to product development and marketing to create demand for the HCF product. (Ex. 1, ¶¶ 41, 46-47). Unless enjoined by this Court, Duke can continue to undercut LTI's pricing by offering LTI's patented technology at a lower price. This drives down the value of the Asserted Patents and the value that LTI can derive from its exclusive rights in the patents.

### 4.    Damage to LTI's Goodwill and Reputation Shows Irreparable Harm.

Finally, Duke's continued use of the patented technology will likely result in damage to LTI's reputation and goodwill, which cannot be quantified or remedied by monetary damages alone.

LTI currently enjoys a reputation as the leading manufacturer of HCF products in the industry, and works hard to maintain that reputation. (Ex. 1, ¶¶ 30, 42). LTI has created a brand and market around its patented QuickSwitch technology, distinguishing itself from its competitors in the industry. (Ex. 1, ¶ 30). Duke's use of the patented technology deprives LTI of using these key differentiators in the market to promote its products. *See Celsis In Vitro*, 664 F.3d at 930-31 ("During the growth stage of a product, it is particularly crucial to be able to distinguish oneself from competitors. This includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market.").

Further, Duke's infringement undermines LTI's goodwill and reputation as an innovator. (Ex. 1, ¶ 42). A patentee's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors'" products. *Douglas Dynamics*, 717 F.3d at 1344-45. By copying LTI's technology and reselling it under a Duke label, Duke is undermining LTI's reputation as an innovator in the industry. (Ex. 1, ¶ 42). LTI has not licensed the Asserted Patents, and maintaining such exclusivity "is an intangible asset that is part of a company's reputation," which is undermined by infringement. *Douglas Dynamics*, 717 F.3d at 1345.

As the creator of the HCF technology, LTI is forever associated with the technology.  Thus, when Duke's HCF Product fails to perform as advertised, it casts damage to the concept of the HCF technology and, in turn, LTI.  (Ex. 1, ¶¶ 43-44).  Indeed, Duke's HCF Product uses inferior materials making it susceptible to malfunction.  (Ex. 3, ¶ 12).  Monetary damages cannot compensate LTI should consumers doubt the very product LTI created.  For this additional reason, LTI will be irreparably harmed if its request for a preliminary injunction is denied.

### C.     The Balance of Hardships Factors Entry of an Injunction.

The balance of hardships favors LTI as LTI's hardships in the absence of an injunction would far outweigh any hardship to Duke if it could not continue to infringe the Asserted Patents.  LTI has expended significant time and resources in researching and developing its technology, obtaining patents on the technology, developing a market for the patented technology, and building products covered by the Asserted Patents.  (Ex. 1, ¶ 46).  "[R]equiring [LTI] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [LTI]."  *Bosch*, 659 F.3d at 1156.

In stark contrast, Duke would suffer no hardship that could tip the balance of harms against the issuance of an injunction.  "[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  *Broadcom Corp*., 543 F.3d at 704 (citation omitted); *see also Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).  Instead of investing in research and development to design an HCF product around LTI's patents, Duke seeks to carry on its use of LTI's patented technology, without LTI's permission, and sell its copycat product to compete directly with LTI.  If Duke is allowed to continue with its infringing strategy, it will be rewarded financially for not respecting LTI's patents.  Meanwhile, LTI will be prevented from exercising the essential attributes of its patent grants—the right to exclude its competitors from infringing its

patent.  *Bosch*, 659 F.3d at 1149; *Acumed*, 551 F.3d at 1327-31 (citing 35 U.S.C. § 154(a)(1) (2000)).

Any alleged harm to Duke from an injunction is of its own making.  That is because "neither commercial success, nor sunk development costs, shield an infringer from injunctive relief."  *i4i*, 598 F.3d at 863.  In other words, Duke "is not entitled to continue infringing simply because it successfully exploited its infringement."  *Id.*; *see also Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997) (stating that the possibility of being put out of business by a preliminary injunction "does not insulate it from the issuance of a preliminary injunction" and that "[s]mall parties have no special right to infringe patents simply because they are small").  This is especially true here given the evidence of copying.  *See Celsis In Vitro*, 664 F.3d at 931 (whether infringer took a calculated risk in selling a product that may infringe a known patent is relevant factor to equitable balancing).  Duke should not be rewarded for copying LTI's patented technology instead of developing a non-infringing method or system of its own.

Granting an injunction will maintain the status quo as LTI—and not Duke—will continue to be the only supplier of LTI's patented technology in the United States.  *Litton Sys.*, 750 F.2d at 961.  Because Duke is a new market entrant, selling many other product lines, the relief would not cause serious harm to Duke's business.  In fact, Duke could simply resume purchasing LTI's QuickSwitch through dealers for use in its counters as it did for five years.  Thus, the only feasible hardship to Duke is that it can no longer make a profit by infringing LTI's patents.  Permitting the infringement to continue, however, will seriously injure LTI—a company that specializes in HCF technology and relies on the patented features to promote its products—its business, future opportunities, goodwill, potential revenue, and the very right to exclude that which is the essence

of the intellectual property at issue. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019) (finding substantial hardship where "[Plaintiff] would be forced to compete with its own patented invention"). Thus, the balance of hardships favors injunction.

### D.  The Public Interest Will Be Served by Entry of an Injunction.

The public interest favors granting a preliminary injunction in this case. "[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple*, 809 F.3d at 647; *see also i4i Ltd.*, 598 F.3d at 863; *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("[A]bsent any other relevant concerns . . . the public is best served by enforcing patents that are likely valid and infringed."). A patent owner's right to exclude others from practicing its patented invention encourages innovation and investment-based risk. *Sanofi-Synthelabo*, 470 F.3d at 1383.

Here, the public interest prong weighs heavily in favor of LTI, as granting the injunction to uphold LTI's patent rights serves the public's interest in a strong patent system. LTI has been granted three patents on the QuickSwitch technology, and thus has the right to exclude its competitors from infringing its patents. There is no critical public interest at risk that would outweigh the public's interest in promoting intellectual property rights and the innovation and investment they encourage. Indeed, as the Federal Circuit has recognized, "selling a lower priced product does not justify infringing a patent" because if it did, "most injunctions would be denied because copiers universally price their products lower than innovators." *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993).

The public interest is served by healthy and fair competition in the marketplace, which is advanced by keeping infringing products off the market. *See, e.g.*, *TiVo Inc. v. EchoStar Commc'ns Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006), *aff'd in part*, *rev'd in part on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008). Thus, this factor weighs in LTI's favor.

E.     **The Balance of Factors Favors Entering LTI's Proposed Injunction.**

LTI has shown that all four factors favor the requested injunctive relief.  The harm that LTI will suffer without injunctive relief far outweighs any potential harm to Duke.  Duke chose to copy LTI's patented technology and produce an infringing product.  That Duke may have to expend additional resources to compete without infringing does not weigh against entry of an injunction.  This is a problem of Duke's own making.  *Bosch*, 659 F.3d at 1156.

Moreover, given Duke's recent entry into the market, it would be less prejudicial to enter an injunction now, as opposed to after Duke has invested more resources in its HCF Product.  *See Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1078 (D. Mass. 1979) (enjoining defendant at commencement of sales would "nip[] the operation in the bud" whereas denial of preliminary relief would result in defendant's entrenchment, "making permanent relief more problematical").

## IV.     CONCLUSION

For the foregoing reasons, LTI respectfully requests that the Court grant LTI's Motion.

DATED:  August 20, 2020

Respectfully submitted,

CARMODY MacDONALD P.C.

By:     /s/ David P. Stoeberl
David P. Stoeberl, #46024(MO)
Tyler C. Schaeffer, #60847(MO)
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 Telephone
(314) 854-8660 Facsimile
dps@carmodymacdonald.com
tcs@carmodymacdonald.com

and

KILPATRICK TOWNSEND & STOCKTON LLP
D. Clay Holloway (Georgia Bar No. 363296)
(*pro hac vice* pending)
cholloway@kilpatricktownsend.com
David Reed (Georgia Bar No. 185146)
(*pro hac vice* pending)
dreed@kilpatricktownsend.com
Richard Goldstucker (Georgia Bar No. 940472)
(*pro hac vice* pending)
rgoldstucker@kilpatricktownsend.com
Courtney Dabbiere (Georgia Bar No. 885177)
(*pro hac vice* pending)
cbabbiere@kilpatricktownsend.com
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Telephone: (404) 815-6500
Facsimile:  (404) 815-6555

Kathleen Geyer (Washington Bar No. 55493)
(*pro hac vice* pending)
kgeyer@kilpatricktownsend.com
1420 5th Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
Facsimile:  (206) 623-6793

Attorneys for Plaintiff Low Temp Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

_/s/ David P. Stoeberl_